Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VI

| WB & BUILDING CORPORATION<br><br>Apelante<br><br>v.<br><br>MUNICIPIO DE SAN JUAN<br><br>Apelado | KLAN202400136 | *CERTIORARI* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso núm.: KAC2015-0586<br><br>Sobre: Incumplimiento de contrato |
|---|---|---|

Panel integrado por su presidenta la jueza Ortiz Flores, el juez Rivera Torres, la jueza Rivera Pérez y el juez Campos Pérez.

**Rivera Torres, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 18 de abril de 2024.

Comparece ante este Tribunal de Apelaciones WB & Building Corporation (WB o la parte apelante) mediante el recurso de apelación de epígrafe, solicitándonos la revocación de la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (el TPI), el 15 de diciembre de 2023, notificada el 18 del mismo mes y año. Mediante dicho dictamen, el foro primario declaró *Ha Lugar* a la *Solicitud de Sentencia Sumaria* presentada por el Municipio Autónomo de San Juan (el Municipio o la parte apelada) y desestimó la demanda con perjuicio.

Por los fundamentos que exponemos, se confirma el dictamen apelado.

### I.

La presente causa de acción fue instada el 24 de junio de 2015. En síntesis, WB alegó que el 30 de junio de 2012 otorgó con el Municipio un acuerdo para el arrendamiento y construcción del "Nuevo Centro de Gobierno Municipal de Río Piedras", intitulado

"Acuerdo Preliminar para el Arrendamiento de Bienes Inmuebles Municipales para el Diseño, Construcción, Financiamiento, Operación y Mantenimiento del Nuevo Centro de Gobierno Municipal de Río Piedras" (el Acuerdo), y que el Municipio incumplió con el mismo.[1] Así, solicitó se le compense por la pérdida de las ganancias proyectadas, las cuales estimó en no menos de $53,666,787, más daños adicionales no menores de $2,598,721 por los gastos y costos incurridos.[2]

El Municipio contestó la demanda negando en su mayoría las alegaciones de incumplimiento. Entre sus *Defensas Afirmativas* levantó que "[e]l costo multimillonario para el desarrollo de una Nueva Torre, constituye a todas luces una obra extravagante e innecesaria contraria a la ley, la moral y al orden público."[3] Además, señaló que "[l]a administración municipal precedente no cumplió con las normas procesales requeridas previo a la firma del Acuerdo" y este es ilegal y contrario al interés público.[4]

Luego de múltiples trámites procesales, que no son necesarios consignar, ambas partes litigantes presentaron sendas mociones solicitando se dictara sentencia sumariamente.[5] De igual manera, presentaron sus respectivas oposiciones, réplicas y dúplicas. En resumen, el Municipio argumentó que el Acuerdo era nulo debido a que requería la celebración de una pública subasta y no un proceso de *Solicitud de Propuesta* conocido por sus siglas en inglés como RFP (*Request for Proposal).*[6] Por lo cual, la Legislatura Municipal actuó

---

[1] La referida demanda contiene ciento treinta y dos (132) alegaciones. Véase el Apéndice del Recurso, a las págs. 1-26.

[2] El 13 de abril de 2016 el TPI dictó una *Sentencia Parcial* desestimando la acción instada contra la entonces alcaldesa de San Juan, Hon. Carmen Yulín Cruz Soto, en su carácter personal. *Íd.*, a las págs. 159-163.

[3] *Íd.*, alegación 3, a la pág. 57.

[4] *Íd.*, alegaciones 7, 8, 9, 10 y 11, a la pág. 58.

[5] El Municipio presentó una *Solicitud de Sentencia Sumaria* … el 10 de abril de 2017. WB presentó una *Moción de Sentencia Sumaria* el 16 de mayo de 2018. Véase el Apéndice del Recurso, a las págs. 301 y 1173, respectivamente.

[6] El Municipio consignó treinta y ocho (38) hechos incontrovertidos y acompañó varios *exhibits* enumerados alfabéticamente (Exhibits A-I). Véase el Apéndice del Recurso, a las págs. 303-310.

*ultra vires* al aprobar la Ordenanza Núm. 31, Serie 2010-2011, por ser contraria a la Ley núm. 81 de Municipios Autónomos de Puerto Rico, *infra*, aplicable al caso de autos.[7] Por su parte, WB aduce todo lo contrario; es decir, que el acuerdo es válido y vinculante por haber sido realizado conforme a la Ley núm. 81, *supra*, y el reglamento aplicable.[8] El Municipio replicó e indicó que la obligación principal del Acuerdo <u>era un contrato de construcción y no uno de arrendamiento</u>.[9] WB instó una dúplica alegando que el contrato no era uno típico de construcción, <u>sino un "leasing" por el cual se le transfirió el riesgo económico</u> que el Municipio hubiese tenido.[10]

De otra parte, en su solicitud de sentencia sumaria WB argumentó que, para el proyecto de rehabilitación de Río Piedras, el Municipio propuso un negocio jurídico a través del cual el ente privado asumiría todos los riesgos.[11] Así, el Municipio solo se comprometía a arrendar la propiedad para su uso, con el derecho de adquirirla al cabo de treinta (30) años. Alegó, que <u>dicho modelo es uno válido y el proceso de RFP para su adjudicación cumplió con todas las formalidades</u>. En consecuencia, reiteró que el Municipio debe resarcir los daños que sufrió por el incumplimiento. En su oposición, el Municipio sostuvo que el Acuerdo es nulo y que la doctrina de actos propios no opera en su contra.[12] En la *Réplica a la Oposición …,* WB adujo que el Municipio incumplió los requisitos de

---

[7] La Ley núm. 81 de 30 de agosto de 1991, según enmendada, conocida como la *Ley de Municipios Autónomos de Puerto Rico*, 21 LPRA sec. 4001 *et seq.*, fue derogada por la por la Ley núm. 107-2020, conocida como el *Código Municipal de Puerto Rico.* Sin embargo, los hechos del presente caso ocurrieron vigente la derogada ley.

[8] Véase la *Oposición a Solicitud de Sentencia Sumaria* presentada por WB el 14 de agosto de 2012. Apéndice del recurso, a las págs. 835-1072.

[9] *Íd.*, a las págs. 1073-1155.

[10] *Íd.*, a las págs. 1156-1172.

[11] WB propuso setenta y seis (76) hechos y acompañó varios *exhibits* los cuales fueron enumerados alfabéticamente (Exhibits A-Z). Véase el Apéndice del recurso, a las págs. 1175-1186.

[12] El Municipio presentó su oposición mediante una moción titulada *Moción en Torno a la Segunda Moción de Sentencia Sumaria presentada por la Parte Demandante* en la cual reiteró que todas las partes argumentaron *in extenso* sus respectivas posturas y estas quedaron sometidas para adjudicación. *Íd.,* a las págs. 1731-1733.

la Regla 36.4 de las Reglas de Procedimiento Civil, y que erró al indicar que no le aplica la doctrina de actos propios.[13]

El 23 de mayo de 2019, el TPI dictó una *Sentencia Parcial* declarando *Ha Lugar* a la *Solicitud de Sentencia Sumaria Parcial* que presentara WB el 8 de marzo de 2017, pidiendo la entrega de la cantidad pagada en concepto de adelanto de los cánones de arrendamiento.[14] En consecuencia, el foro apelado ordenó al Municipio devolverle a WB un millón setenta y tres mil seiscientos dólares ($1,073,600) más los intereses correspondientes.[15] En dicho dictamen, se señaló que el petitorio se circunscribía "única y específicamente a la devolución" del adelanto de los cánones de arrendamiento que WB pagó al Municipio.[16] Destacamos que el TPI consignó diecisiete *Determinaciones de Hechos* entre ellas, que el 28 de agosto de 2012, el Municipio notificó formalmente y solicitó a WB el pago por adelantado de los cánones de arrendamiento y que el referido cheque fue cobrado y depositado en la cuenta núm. 030-094909 del Municipio.[17] Además, consignó que la obra se paralizó en el 2013.[18] Así, concluyó que WB "pagó dicha cantidad en cumplimiento de una obligación contractual pactada como resultado de un trámite administrativo organizado y convocado por el Municipio y que, aun cuando se ha cuestionado su validez, el Código Civil establece claramente que, resuelta la obligación, corresponde la devolución de las prestaciones."[19]

El 15 de diciembre de 2023, el TPI adjudicó las solicitudes de sentencia sumaria que tenía ante su consideración y dictó la *Sentencia* aquí apelada. En el referido dictamen, consignó cuarenta

---

[13] *Íd.,* a las págs. 1734-1740.
[14] *Íd.,* a las págs. 182-192.
[15] La referida *Sentencia Parcial* fue confirmada por esta *Curia* mediante una *Sentencia* dictada el 3 de diciembre de 2019 (KLAN201901008). *Íd.,* a las págs. 1765-1770. El Tribunal Supremo declaró *No Ha Lugar* a la *Petición de Certiorari*. *Íd.,* a la pág. 1772.
[16] *Íd.,* a la pág. 1753.
[17] Véase la Determinación de Hechos núm. 9, Apéndice del recurso, a la pág. 1756.
[18] *Íd.,* a la pág. 1761.
[19] *Íd.,* a las págs. 1762-1763.

y tres (43) *Determinaciones de Hechos,* entre ellas, que la Junta de Subasta del Municipio no adjudicó ni autorizó: (1) la "Solicitud de Propuestas para el Diseño, Construcción, Financiamiento, Operación y Mantenimiento del Nuevo Centro de Gobierno Municipal de Río Piedras (Proyecto Río 2012)"; (2) el "Aviso de Recomendación para Contratación"; (3) la otorgación del contrato; (4) la Reconsideración; (5) la Resolución Final, y (6) no intervino de manera alguna en el proceso de evaluación del RFP, la selección y contratación de WB.[20] En sus *Conclusiones de Derecho* el foro apelado razonó lo siguiente:[21]

> ...
> Surge del expediente de autos que la controversia central que corresponde resolver [es] si el contrato que otorgaron [WB] y el [Municipio] fue válido o nulo. Según el [Municipio], el Contrato impugnado requería la celebración de una subasta adjudicada por la Junta de Subastas del [Municipio] conforme la Ley de Municipios Autónomos, *supra,* **al tratarse de un proyecto de construcción**. Por otra parte, [WB] arguyó, en síntesis, que el Contrato impugnado no fue un típico contrato de construcción, sino que al este ser un contrato de *"design-build"* bajo la modalidad *"Design-Build-Operate-Maintain-Lease-Purchase"* o *"Design-Build-Finance-Operate-Maintain-Transfer",* se podía llevar a cabo su subasta mediante el procedimiento de RFP, por lo que este es válido. Analizados los autos, se determina que no le asiste la razón a [WB]. Veamos.
> ...
> ...
> A pesar de que [WB] alegó que el Contrato en controversia no se trató de un contrato de construcción típico, lo cierto es que, de **un análisis de este, surge claramente que su fin fue la construcción de la Nueva Torre Municipal**. [...]
> Es decir, el Contrato propio reconoció que, con su aprobación, no se tendría que llevar a cabo un procedimiento común de subasta. Sin embargo, según discutido, el Art. 10.001 de la Ley de Municipios Autónomos, *supra,* dispone que salvo en casos que expresamente se disponga lo contrario, el municipio deberá cumplir con el procedimiento de subasta formal, cuando se trate de "[t]oda obra de construcción o mejora pública por contrato que excede de doscientos mil (200,000) dólares." Además, el Art. 10.006 de la Ley de Municipios Autónomos, *supra,* requiere que este tipo de contrato sea adjudicado por la Junta de Subastas del municipio, evento que no ocurrió según surge de los hechos. Aunque en nuestro ordenamiento se reconoce el proceso de requerimiento de propuestas (RFP) como alternativa, **lo cierto es que en el caso de autos se**

---

[20] Véanse las Determinaciones de Hechos núms. 24, 27 y 40-43. Apéndice del recurso a las págs. 1783 y 1785.
[21] Véase el Apéndice del recurso, a las págs. 1795-1798.

> **debía cumplir con la Ley de Municipios Autónomos**, *supra.*
>
> [...] Debido a que el Contrato **se otorgó en violación a las disposiciones expresas de la Ley de Municipios Autónomos**, *supra*, **se determina que este es nulo**.[...]
>
> Debido a que ya hubo sentencia ordenando al [Municipio] a devolverle ... el canon de arrendamiento del área donde se construiría la Nueva Torre Municipal, **procede la desestimación** de la *Demanda* de epígrafe. [Énfasis nuestro]

Inconforme, WB acude ante este foro intermedio señalando que el foro primario incurrió en los siguientes errores:

> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCLUIR IMPLÍCITAMENTE QUE EL CONTRATO ENTRE LA DEMANDANTE WALL & BUILDING CORPORATION Y EL DEMANDADO MUNICIPIO AUTÓNOMO DE SAN JUAN ES UNO DE CONSTRUCCIÓN <u>PÚBLICA</u>, CUANDO EN REALIDAD SE TRATA DE UN CONTRATO DE ARRENDAMIENTO CON DERECHO A LA EDIFICACIÓN DE UNA ESTRUCTURA O CONSTRUCCIÓN PRIVADA, PROPIEDAD DEL ARRENDATARIO.
>
> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE EL CONTRATO ENTRE LA PARTE DEMANDANTE WALL & BUILDING CORPORATION Y EL DEMANDADO MUNICIPIO AUTÓNOMO DE SAN JUAN ES NULO.
>
> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LAS DOCTRINAS DE EQUIDAD DE BUENA FE Y ACTO PROPIOS NO APLICAN EN EL PARTICULAR CONTEXTO DE LOS AUTOS.
>
> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL RESOLVER POR SENTENCIA SUMARIA LA DESESTIMACIÓN DE LA DEMANDA CUANDO SE ENCUENTRAN EN CONTROVERSIA MÚLTIPLES HECHOS MATERIALES, INCLUYENDO LA INTENCIÓN DE LAS PARTES EN LA CONTRATACIÓN, Y POR TRATARSE DE UN ASUNTO DE ALTO INTERÉS PÚBLICO.

El 22 de febrero de 2024, dictamos una *Resolución* concediéndole treinta (30) días a la parte apelada para expresarse. Luego de otorgada una prórroga, el 12 de abril de 2024, dicha parte cumplió con lo ordenado. Así, nos damos por cumplidos y decretamos perfeccionado el recurso.

Luego de evaluar los escritos de ambas partes y el expediente de autos; así como del estudio del derecho aplicable, procedemos a resolver las presentes controversias.

**II.**

**Mecanismo de Sentencia Sumaria**

En nuestro ordenamiento, el mecanismo de la sentencia sumaria está gobernado por la Regla 36 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36, la cual autoriza a los tribunales a dictar sentencia de forma sumaria si mediante declaraciones juradas u otro tipo de prueba se demuestra la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. Más específicamente, la Regla 36.1, 32 LPRA Ap. V, R. 36.1, atiende la solicitud de este tipo de disposición a favor de la parte reclamante en un pleito, mientras que la Regla 36.2, 32 LPRA Ap. V, R. 36.2, permite su petición a favor de la parte contra la que se reclama. En ambas reglas se establece lo siguiente:

> **Regla 36.1. A favor de la parte reclamante**
>
> Una parte que solicite un remedio podrá presentar, ..., una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada.
>
> **Regla 36.2. A favor de la parte contra quien se reclama**
>
> Una parte contra la cual se haya formulado una reclamación podrá presentar, ..., una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación.

Entretanto, la Regla 36.3, 32 LPRA Ap. V, R. 36.3., dispone los requisitos de contenido de la moción de sentencia sumaria y de la contestación a esta, entre otras particularidades del procedimiento. Estos requisitos, como los párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, no son un mero formalismo, ni constituye un simple requisito mecánico sin sentido. *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 434 (2013).

En un primer plano, mediante el uso del mecanismo discrecional de la sentencia sumaria, se aligera la tramitación de un caso, puesto que, ante la ausencia de controversia de hechos, al tribunal solo le corresponde aplicar el derecho. *Oriental Bank v. Perapi et al.,* 192 DPR 7, 25 (2014). Así, sirve para propiciar la solución justa, rápida y económica de los litigios civiles que no presentan controversias genuinas de hechos materiales y que, por lo tanto, no requieren la celebración de un juicio en su fondo, ya que lo único que resta es dirimir una o varias controversias de derecho. *Íd.*

Este tipo de resolución procede en aquellos casos en los que no existen controversias **reales y sustanciales** en cuanto a los **hechos materiales** y, por lo tanto, lo único que resta es aplicar el derecho. *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 109 (2015). La precitada Regla 36 de las de Procedimiento Civil, *supra,* dispone, en esencia, que para permitir este tipo de adjudicación resulta necesario que, de las alegaciones, deposiciones, contestaciones a interrogatorios, admisiones, declaraciones juradas y cualquier otra evidencia surja que no existe controversia real y sustancial, respecto a ningún hecho esencial y pertinente; y en adición, que se deba dictar sentencia sumaria como cuestión de derecho. *Íd.* En este sentido, solo procede dictarla cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable y que el tribunal cuenta con la verdad de todos los hechos necesarios para resolver la controversia. *Íd.,* a las págs. 109-110.

Es decir, por un lado, al promovente de la moción le toca establecer su derecho con claridad y demostrar que no existe controversia en cuanto a ningún hecho material, o sea ningún componente de la causa de acción. *Íd.,* a la pág. 110. Por el otro, al oponente le corresponde establecer que existe una controversia que

sea real en cuanto a algún hecho material y, en ese sentido, no cualquier duda es suficiente para derrotar la solicitud de sentencia sumaria. *Íd.* Cabe recordar que, en este contexto, un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Íd.* Mas específicamente, el oponente debe controvertir la prueba presentada y no debe cruzarse de brazos, pues de lo contrario se expone a que se acoja la solicitud de sentencia sumaria y se le dicte en contra. *Ramos Pérez v. Univisión,* 178 DPR 200, 214-215 (2010). Esto significa que está obligado a contestar de forma detallada y específica aquellos hechos pertinentes que demuestran la existencia de una controversia real y sustancial que requiere dilucidarse en un juicio. *Íd.,* a la pág. 215. En este ejercicio, debe presentar declaraciones juradas o documentos que pongan en controversia los hechos alegados por el promovente, recordando que tampoco puede descansar en meras alegaciones, sino que debe proveer evidencia sustancial de los hechos materiales en disputa. *Íd.*

No obstante lo anterior, no oponerse a la solicitud de sentencia sumaria no implica, ni que procederá dictarla obligatoriamente, si existe una controversia legítima sobre un hecho material, ni que corresponderá dictarla a favor de su proponente si no procede en derecho. *Íd.*

Ahora bien, se han establecido ciertas reglas limitantes de la discreción en el uso de la moción de sentencia sumaria. Por un lado, la determinación en cuanto a esta debe guiarse por un principio de liberalidad a favor de la parte que se opone, lo cual persigue evitar la privación del derecho de todo litigante a su día en corte cuando existen controversias de hechos legítimas y sustanciales que deben ser resueltas. *Íd.,* a las págs. 216-217. Por el otro, como norma general, los tribunales están impedidos de dictar sentencia sumaria en cuatro instancias: (1) cuando existan hechos materiales y

esenciales controvertidos; (2) cuando hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) cuando de los propios documentos que acompañan la moción surge que existe una controversia sobre algún hecho material y esencial; o (4) cuando como cuestión de derecho no procede. *Oriental Bank v. Perapi*, supra, a las págs. 26-27. Dicho esto, cabe indicar que la moción de sentencia sumaria no está excluida en ningún tipo de pleito, puesto que, sin importar cuán complejo sea un pleito, <u>puede dictarse si de una moción de sentencia sumaria bien fundamentada surge que no hay controversia sobre hechos materiales</u>. *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 112.

En lo relativo al ejercicio de la facultad revisora de este Tribunal de Apelaciones, sobre la procedencia de la sentencia sumaria, **debemos utilizar los mismos criterios que el Tribunal de Primera Instancia**. *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 115. En *Meléndez González,* el Tribunal Supremo atemperó este estándar a las exigencias de las nuevas Reglas de Procedimiento Civil y a lo que ya había establecido hace una década en *Vera v. Dr. Bravo*, 161 DPR 308, 334-335 (2004). Así las cosas, consignó el siguiente estándar:

> "Primero, reafirmamos lo que establecimos en *Vera v. Dr. Bravo, supra,* a saber: el Tribunal de Apelaciones se encuentra en la misma posición del Tribunal de Primera Instancia al momento de revisar Solicitudes de Sentencia Sumaria. En ese sentido, está regido por la Regla 36 de Procedimiento Civil, *supra,* y aplicará los mismos criterios que esa regla y la jurisprudencia le exigen al foro primario. Obviamente, el foro apelativo intermedio estará limitado en cuanto a que no puede tomar en consideración evidencia que las partes no presentaron ante el Tribunal de Primera Instancia **y tampoco adjudicar los hechos materiales en controversia, ya que ello le compete al foro primario luego de celebrado un juicio en su fondo**. La revisión del Tribunal de Apelaciones es de *novo* y debe examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor.
>
> Segundo, por estar en la misma posición que el foro primario, el Tribunal de Apelaciones debe revisar que tanto la Moción de Sentencia Sumaria como su

Oposición **cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civi**l, supra, y discutidos en *SLG Zapata-Rivera v. J.F. Montalvo*, supra.

Tercero, **en el caso de revisión de una Sentencia dictada sumariamente**, el Tribunal de Apelaciones **debe revisar si en realidad existen hechos materiales en controversia**. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. Esta determinación se puede hacer en la Sentencia que disponga del caso y puede hacer referencia al listado numerado de hechos incontrovertidos que emitió el foro primario en su Sentencia.

Cuarto y, por último, de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar de *novo* si el Tribunal de Primera Instancia **aplicó correctamente el Derecho a la controversia**." (Énfasis nuestro). *Meléndez González et al. v. M. Cuebas*, supra, a las págs. 118-119.

## El Mecanismo de *Request for Proposal* (RFP*)*

El 26 de septiembre de 2012 nuestro alto foro dictó *Sentencia* en *Maranello et al. v. O.A.T*, 186 DPR 780 (2012). Si bien lo allí resuelto no constituye un precedente, en este se reitera el derecho aplicable al mecanismo de propuestas por lo que citamos a continuación las siguientes expresiones.

Aunque la subasta formal es el método tradicional para regular la adquisición de bienes y servicios, se ha validado, como alternativa, **la compra negociada** y el mecanismo de requerimiento de propuestas o "Request for Proposal" (RFP) **cuando se trata de bienes o servicios especializados que involucran aspectos altamente técnicos y complejos**, o cuando existen **escasos competidores cualificados**. *Caribbean Communications v. Pol. de P.R.*, supra, pág. 996; *R&B Power v. E.L.A.*, 170 D.P.R. 606, 621-622 (2007).

El mecanismo de propuestas se destaca por su mayor informalidad y flexibilidad, así como por el **grado de discreción** que se le confiere a la entidad pública en la consideración de la propuesta recibida, en comparación con la subasta tradicional. *R&B Power v. E.L.A.*, supra, pág. 623. Además, a diferencia del procedimiento formal de subasta, el RFP permite la compra negociada y confiere a los licitadores **la oportunidad de revisar y modificar sus ofertas** antes de la adjudicación de la buena pro. Id., pág. 621.

Por otro lado, contrario al proceso de una subasta formal en el que se someten las propuestas selladas, el RFP **admite preguntas y sugerencias de parte de los licitadores** para delinear una propuesta que **se ajuste a las necesidades particulares de la agencia**. Se trata de un proceso de negociación entre la agencia y aquellos licitadores que cuentan **con mayor grado de**

> **conocimiento especializado en el servicio requerido**.
>
> Aunque el procedimiento de subasta formal y el requerimiento de propuestas son distintos, no son totalmente incompatibles. El *RFP*, por ser un mecanismo alterno al procedimiento tradicional, necesariamente participa de alguna de las características de la subasta formal. Específicamente, al igual que la subasta formal el requerimiento de propuestas está sujeto a los requisitos de notificación, así como los procedimientos de reconsideración y revisión judicial contenidos en la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 del 12 de agosto de 1988 (3 L.P.R.A. sec. 2101 *et seq*.). *Caribbean Communications v. Pol. de P.R.*, supra, pág. 998. [Énfasis nuestro]. *Íd.*, a las págs. 790-791.

**Ley de Municipios Autónomos**

La Ley núm. 81, *supra*, aplicable a los hechos del presente caso, era conocida como la Ley de Municipios Autónomos de Puerto Rico, tenía como propósito otorgar a los municipios la mayor autonomía posible y proveerles las herramientas financieras; así como los poderes y facultades necesarias para asumir una función central y fundamental en su desarrollo urbano, social y económico. Artículo 1.002 de la Ley núm. 81, *supra*, 21 LPRA sec. 4001.

Respecto a los mecanismos y formas para la adquisición y disposición de bienes; así como las subastas que se tenían que ser celebradas por los municipios para dicho fin, ello estaba regido específicamente por los Artículos 10.001-10.007 la Ley núm. 81, *supra*, 21 LPRA secs. 4451-4457, respectivamente. Así, como por el *Reglamento para la Administración Municipal*, Reglamento Núm. 7539 de 18 de julio de 2008, el cual regulaba los procedimientos de subastas en los ayuntamientos municipales.[22] Ambos cuerpos legales conceden facultad al organismo encargado de dichos procesos, la Junta de Subastas, para adjudicar subastas en consideración a la habilidad, responsabilidad económica, reputación e integridad comercial del licitador. De igual manera, se encarga del cumplimiento con las especificaciones, los términos de

---

[22] Este fue derogado por el *Reglamento para la Administración Municipal de 2016*, Reglamento Núm. 8873 del 19 de diciembre de 2016. No obstante, es el aplicable a los hechos.

entrega y cualesquiera otras condiciones que se hayan incluido en el pliego de subasta. P*ta.; Arenas Concrete, Inc. v. J. Subastas*, 153 DPR 733, 739 (2001).

A continuación, consignamos las disposiciones pertinentes al recurso ante nuestra consideración.

El Artículo 9.005, 21 LPRA sec. 4455, del estatuto titulado *Bienes municipales- Enajenación*, disponía:

> **Toda** permuta, gravamen, **arrendamiento**, venta, donación o cesión de propiedad municipal deberá ser aprobada por la Legislatura Municipal, mediante ordenanza o resolución al efecto.
> La venta y **arrendamiento de cualquier propiedad municipal deberá hacerse mediante el proceso de subasta pública**. [Énfasis nuestro]
> …

Ahora bien, el Artículo 9.011, 21 LPRA sec. 4461, de la Ley núm. 81, *supra*, establecía cuándo el arrendamiento se realizará sin subasta pública. Al respecto, el precepto leía:

> No obstante, lo dispuesto en la sec. 4501 [Artículo 10.001] de este título, **cuando el interés público** así lo requiera, el municipio mediante ordenanza podrá reglamentar el arrendamiento de la propiedad municipal mueble e inmueble **a base de un canon razonable y sin sujeción al requisito de subasta pública**. En dicha ordenanza **se especificarán las razones por las cuales se considera justo y necesario prescindir del requisito de subasta**. El canon de **arrendamiento razonable** se determinará tomando como base el costo y la vida útil de la propiedad y los tipos de arrendamiento prevalecientes en el mercado. […][Énfasis nuestro]

Por su parte, en relación a la *Compra de Equipos, Suministros y Servicios* el Artículo 10.001, 21 LPRA sec. 4501, de la ley preceptuaba las normas generales aplicables al requisito de subasta pública:

> Excepto en los casos que expresamente se disponga otra cosa en esta Ley, **el municipio cumplirá con el procedimiento de subasta pública**, cuando se trate de:
> (a) …
> (b) **Toda obra de construcción o mejora pública por contrato que exceda de doscientos mil (200,000) dólares**.
> (c) […] [Énfasis nuestro]

De otro lado, mencionaba el Artículo 10.002, 21 LPRA sec. 4502, de la Ley núm. 81, *supra,* que quedan excluidas de la celebración de subasta pública las compras de bienes muebles y servicios en los siguientes casos:

> (a) ...
> (b) ...
> (c) ...
> (d) ...
> (e) ...
> (f) **Cuando no concurran licitadores y exista el peligro de perderse cualquier oportunidad para adquirir los bienes**, suministros, equipo o servicios que se interesan, previa **justificación escrita que explique el peligro y necesidad que obliga a proceder con la compra o contratación**.
> (g) ...
> (h) **Toda construcción de obra o mejora pública a realizarse por la administración municipal. De requerirse la compra de los materiales y suministros para realizar la obra, la misma se hará a tenor con la ley y la reglamentación vigente**.
> (i) **Todo contrato para la construcción**, reparación, reconstrucción de obra o mejora pública **que no exceda de doscientos mil (200,000) dólares**, previa consideración de por lo menos tres (3) cotizaciones en la selección de la más beneficiosa para los intereses del municipio.
> [...]. [Énfasis nuestro]

Por último, destacamos que entre las funciones y deberes de la Junta se encuentra entender y adjudicar "**todas las subastas que se requieran por ley**, ordenanza o reglamento **y en los contratos de arrendamiento** de cualquier propiedad mueble o inmueble y de servicios, tales como servicios de vigilancia, mantenimiento de equipo de refrigeración y otros. [...]." Artículo 10.006, 21 LPRA sec. 4506.

**III.**

Primariamente resulta hacer necesario consignar que la parte apelante y la parte apelada cumplieron con los requisitos procesales formales que viabilizan la consideración de una petición para resolver el caso sumariamente, haciendo referencia a los párrafos enumerados y detallando la evidencia pertinente conforme establece la Regla 36.3 de las Reglas de Procedimiento Civil, *supra.*

En lo relativo al ejercicio de nuestra facultad revisora,

reiteramos que es *de novo* y debemos utilizar los mismos criterios que el Tribunal de Primera Instancia. Respecto al estándar de la Regla 36.1 de las Reglas de Procedimiento Civil, *supra,* precisamos que esta autoriza a los tribunales a dictar sentencia de forma sumaria si mediante declaraciones juradas u otro tipo de prueba se demuestra la <u>inexistencia de una controversia sustancial de hechos esenciales y pertinentes</u>. Como indicamos, de proceder este mecanismo discrecional se aligeraría la tramitación de un caso, pues el tribunal solo tendría que aplicar el derecho.

Establecido el estándar de análisis veamos si se cometieron los errores señalados por la parte apelante. Los cuales, por estar relacionados entre sí, los discutiremos conjuntamente.

En apretada síntesis, WB argumentó que el contrato celebrado con el Municipio no es uno de construcción sino de arrendamiento, el cual la Ley núm. 81, permitía celebrar mediante el procedimiento informal de RFP. Añadió que, para llegar a dicha conclusión se requería la celebración de una vista evidenciaria para conocer la intención de las partes; por lo que no procedía adjudicar la demanda de epígrafe mediante el mecanismo de sentencia sumaria.

Asimismo, señaló que "**no estamos ante un contrato típico de construcción pública** que exige la adjudicación por subasta conforme el Art. 10.001(b) de la Ley de Municipios Autónomos del 1991 **sino ante un contrato de arrendamiento de inmuebles municipales a tenor con el Art. 9.011 de la misma ley, con autorización y derecho del arrendatario a edificar en los mismos**."[23] Agregó que esta estructura o modalidad transfiere a otro los riesgos de construcción y explotación de un bien inmueble mientras aquella asume el riesgo que represente su uso, y ha sido

---

[23] Véase el escrito de *Apelación,* a la pág. 24. Negrillas y Subrayado en el original.

utilizado por el gobierno para la construcción de varias obras. A manera de ejemplo, detalló proyectos como el Teodoro Moscoso, el Centro Judicial de Aibonito y el estacionamiento en el viejo San Juan para la década de los 60 por la entonces alcaldesa Doña Felisa Rincón de Gautier, construidos bajo esta modalidad. Añadió que, en *Maranello et al, v. O.A.T,* supra, 790-791, el Tribunal Supremo de Puerto Rico validó el mecanismo de RFP en la contratación pública.[24]

Por otro lado, indicó que a los hechos del presente caso le es aplicable la doctrina de equidad, la cual establece que "a nadie es lícito ir ni obrar contra sus propios actos." Así, expresó que el Municipio y la Legislatura Municipal, como titulares del derecho, crearon una situación en la que WB podía confiar de buena fe.

Analizados todos los argumentos presentados; así como examinada la abundante prueba documental, resolvemos que en el presente caso **no existe ningún hecho esencial en controversia**. Por el contrario, los documentos acompañados con las respectivas mociones hablan por sí solos y ninguno requiere su interpretación.

Recordemos que "[l]a necesidad de que los contratos municipales consten por escrito tiene su base en un requisito de carácter formal o sustantivo. El contrato escrito es la mejor evidencia de las obligaciones recíprocas que contraen las partes."[25] En consecuencia, adoptamos todas las determinaciones de hechos consignados en el dictamen apelado y a continuación destacamos varios hechos esenciales.

---

[24] El caso citado por los partes es una *Sentencia* y de los hechos surge que la OAT utilizó el mecanismo de RFP para la construcción y desarrollo del Centro Judicial de Aibonito. Sin duda, y como alegó el Municipio, el Poder Judicial se rige por leyes y reglamentos distintos. Además, destacamos que en el modelo adoptado por la OAT para dicho proyecto el terreno era parte de la propuesta que debía estar incluida por los participantes. Asimismo, en dicha demanda se cuestionaba la evaluación de los criterios del RFP.

[25] Véase, *ALCO Corp. v. Mun. de Toa Alta,* 183 DPR 530, 538 (2011) citando a *Colón Colón v. Mun. de Arecibo,* 170 DPR 718, 726 (2007).

**-a-**

En el presente caso, se aprobó la Ordenanza Núm. 23, Serie 2007-2008, para adoptar el "Plan Maestro para el Redesarrollo y la Revitalización del Distrito Especial de la Plaza de la Convalecencia de Río Piedras" el cual también sería conocido como "Proyecto Río 2012".[26] En la referida Ordenanza se estableció que dicho proyecto contemplaba la adquisición mediante compraventa, cesión, expropiación forzosa, entre otros, de <u>varios solares o parcelas circundantes a la Plaza de la Convalecencia, con el propósito de que el sector privado desarrolle en los mismos proyectos residenciales y/o comerciales, a través del mecanismo o procedimiento de Solicitud de Propuesta (RFP)</u>.[27] **Precisa destacar que en esta no se detalla el porque era necesario prescindir del requisito de subasta pública para la adquisición de los solares y su desarrollo por el sector privado**. A su vez, resaltamos que el ambicioso modelo de rehabilitación proponía crear alrededor de <u>611 nuevas unidades de vivienda, 443,850 pies cuadrados de espacio comercial y de oficina y más de 1,500 espacios de estacionamiento.</u>[28]

De otra parte, en la Sección 18va de la mencionada Ordenanza se especificó que se podrían establecer procedimientos de pre-calificación de proponentes o publicar una Solicitud de Cualificaciones ("Request for Qualifications") junto a una Solicitud de Propuesta (RFP) a los fines de **certificar proponentes** responsivos que tengan el conocimiento, la experiencia y la capacidad financiera para realizar proyectos de desarrollo y revitalización como los que se pretenden con el "Proyecto-Río 2012".[29]

Posteriormente, se aprobó la Ordenanza Núm. 25 Serie 2009-

---

[26] Véase el Apéndice del recurso, a las págs. 335- 368.
[27] *Íd.*, a la pág. 340.
[28] *Íd.*, a la pág. 341.
[29] *Íd.*, a la pág. 364.

2010 para incluir tres (3) parcelas a la lista de solares que el Municipio pretendía adquirir cuyo fin público era desarrollar y construir el "Nuevo Centro de Gobierno Municipal de Río Piedras."[30] El Nuevo Centro albergaría, varias dependencias municipales que se esperaba contarían con cerca de 1,000 empleados, ubicados en un edificio multinivel con alrededor de 10 pies de altura, con cerca de 200 espacios de estacionamiento soterrado, cafetería y sala de cine o proyección para la exhibición de películas.[31]

Así las cosas, el 22 de diciembre de 2010, se aprobó la Ordenanza Núm. 31, Serie 2010-2011, la cual autorizó el arrendamiento de varios solares municipales, **sin sujeción de los requisitos de subasta pública**, para el diseño, construcción, financiamiento, operación y mantenimiento del Nuevo Centro.[32] También la Legislatura Municipal aprobó el Reglamento aplicable a dicho proyecto intitulado *"Reglamento para el arrendamiento de bienes inmuebles municipales, sin sujeción al requisito de subasta pública, para el diseño, construcción, financiamiento, operación y mantenimiento del "Nuevo Centro de Gobierno Municipal de Río Piedras"."*[33]

Luego de realizados ciertos trámites administrativos, que no son necesarios consignar, la parte apelante, WB fue la empresa finalmente seleccionada. El 30 de junio de 2012, se firmó el contrato o acuerdo intitulado "Acuerdo Preliminar y/o Final" aquí en controversia.[34] En este, se acordó **la construcción de un edificio** compuesto de dos (2) alas paralelas y conectadas entre sí, con la siguiente descripción: (a) La primera ala de uso principal que servirá para el establecimiento de oficinas administrativas y de servicios gubernamentales municipales, con la altura máxima de doce (12)

---

[30] *Íd.*, a la pág. 369.
[31] *Íd.*, a la pág. 370.
[32] *Íd.*, a la pág. 378.
[33] *Íd.*, a la pág. 388.
[34] *Íd.*, a las págs. 527.

niveles, doscientas (200) estaciones de estacionamiento, espacios comerciales para venta y servicio para beneficio de los empleados municipales y un helipuerto en la azotea; y (b) La segunda ala de uso comercial que serviría para la ubicación de tres (3) salas de cine y áreas par comercio tipo "café" con una altura de tres (3) niveles.[35]

Respecto a la utilización del mecanismo del RFP, de la Ordenanza Núm. 31, surge lo siguiente:[36]

> POR CUANTO: Dicho impedimento de negociación se debe al método utilizado para la obtención de propuestas para el Nuevo Centro, según autorizado en la Ordenanza ya que el proceso iniciado por el Municipio se enmarcó en la disposiciones aplicables específicamente **a los procesos de subasta pública** contenidas en la Ley de Municipios Autónomo, antes citada, y el Reglamento de Subasta del Municipio de San Juan, siéndole aplicable no solo las disposiciones de ambos cuerpos normativos sino de la jurisprudencia interpretativa sobre los procesos competitivos o de subasta pública en el gobierno para la adquisición de bienes y servicios. [nota al calce omitida]. Sin embargo, el elemento de la negociación es un punto neurálgico para la viabilidad del proyecto en referencia toda vez que permite una confrontación directa y saludable del Municipio con los desarrolladores interesados en la obtención de mejores condiciones para la realización del mismo. La **actual crisis financiera** que el propio Municipio ha tenido que enfrentar en otros proyectos estratégicos **requiere una mayor flexibilidad en el proceso** que no ofrece el actual método de licitación que se ha implementado para el proyecto de referencia. Tal sería el caso para **explorar alternativas viables para el financiamiento del proyecto a largo plazo y la reducción del costo de desarrollo y construcción**, **las cuales serían impensables en un proceso tradicional o formal de RFP o subasta**. Esta situación podría provocar la cancelación del propio RFP en una etapa muy avanzada, retrasando un proyecto de gran envergadura e importancia para el redesarrollo y la revitalización del Centro Urbano de Río Piedras. [Énfasis nuestro]

Asimismo, en cuanto al arrendamiento de los solares se acordó, que durante la fase de diseño y construcción, WB pagaría al Municipio, a partir del 1ro de septiembre de 2012, un canon de arrendamiento de $6,060.60 por 32 meses, y un pago final de $6,060.80 para un total de 33 meses. El canon de arrendamiento durante la fase de uso de la edificación sería una anualidad, a

---

[35] *Íd.*, a las págs. 448-449.
[36] *Íd.*, a la pág. 382.

opción del Municipio por 30 años. Sin embargo, como surge del trámite procesal antes consignado, el Municipio eligió la opción de pago por adelantado de $1,073,600.[37] Ahora bien, sobre el arrendamiento del edificio, el Municipio pagaría a WB **$199,291,235 durante 30 años** por el uso y disfrute a base de los siguientes cánones anuales: los primeros 5 años de $5,845,540, en los años 6-10 $6,147,494, en los años 11-15 $6,499,816, en los años 16-20 $6,772,229, en los años 21-25 $7,115,102 y los años 26-30 $7,478,066.[38] El referido Acuerdo fue elevado a escritura pública y posteriormente radicado en la Oficina del Contralor.[39]

Como previamente expresamos, en el caso de autos, ante la ausencia de hechos materiales en controversia, solo procedía determinar el derecho aplicable. Por lo cual, el mecanismo procesal de sentencia sumaria era el más propicio para su adjudicación. Por ende, solo nos corresponde determinar si conforme a los hechos que no están en controversia, y los antes consignados, el derecho fue correctamente aplicado. Veamos.

**-b-**

Como surge del derecho antes consignado, el procedimiento de pública subasta es el método principal y más común para la adquisición competitiva de bienes y servicios, ya que este promueve la inversión adecuada, responsable y eficiente de los recursos del Estado. Por otro lado, la figura del requerimiento de propuestas (RFP) es un mecanismo alterno informal y flexible. Este permite que el gobierno puede comprar servicios altamente técnicos y complejos, conseguir el servicio requerido cuando existen escasos competidores cualificados, negociar cuando no se pueden precisar en la propuesta

---

[37] Destacamos que, de los autos, ni de los escritos surge que WB haya pagado el arrendamiento estipulado para la fase de diseño y construcción.
[38] *Íd.*, a la pág. 511.
[39] *Íd.*, a las págs. 550-596 y 597.

las especificaciones necesarias, y puede ser utilizado en situaciones excepcionales como son los casos de emergencias.

De entrada, no hay duda alguna que el contrato celebrado entre el Municipio y WB era **uno de construcción** que requería ser adjudicado mediante el mecanismo de subasta pública y no mediante el mecanismo informal de RFP.

Surge de los hechos incontrovertidos antes consignados, que el Proyecto Río 2012 era uno ambicioso y estaba compuesto de muchísimas etapas. Ahora bien, WB fue contratada **para la construcción de un (1) edificio** el cual albergaría el llamado "Nuevo Centro de Gobierno Municipal de Río Piedras." De los documentos presentados, no surge elemento alguno que permita concluir que la figura del requerimiento de propuestas era el más adecuado para la consecución del proyecto. Esto, máxime cuando el desembolso del Municipio por el uso y disfrute de la obra ascendía a $199,291,235. Asimismo, ninguno de los criterios para utilizar el mecanismo de RPF, detallados previamente, están presentes. Por tanto, si adoptáramos la pretensión de WB estaríamos modificando los requisitos generales para el uso del mecanismo de los RFP, según establecidos en nuestra jurisprudencia.[40]

En este punto, en la Ordenanza Núm. 31 se estableció como justo y necesario para prescindir del requisito formal de subasta, **la crisis financiera del Municipio** lo que requería explorar alternativas viables para el financiamiento del proyecto. Sin embargo, los Artículos 10.001 y 11.002 de la Ley núm. 81, antes citados, son claros al indicar que "[t]oda obra de construcción ... que

---

[40] Destacamos que en el Acuerdo se estableció que su propósito era "agrupar, todas las actividades, responsabilidades y riesgos que conlleva diseñar, construir, financiar, operar y mantener la Nueva Torre Municipal, para transferir los mismos a [WB] y **evitar de este modo la erogación cuantiosa de fondos públicos a corto plazo o de forma inmediata**, o subsanada la falta de los mismos para llevar a cabo el proyecto. Además, "se procura que los costos de inversión puedan ser distribuidos por el término del arrendamiento de treinta (30) años en comparación con el tradicional financiamiento "Pay-As-You-Go." [Énfasis nuestro]. *Íd.*, a la pág. 452.

exceda de doscientos mil (200,000) dólares" requiere que el Municipio cumpla con el procedimiento de subasta pública. Lo que evidentemente en el presente caso no ocurrió. Por lo cual, debemos enfatizar que transferir riesgos o costos a un contratista, ante la ausencia de recursos económicos suficientes, no puede ser un criterio para obviar el proceso de subasta pública, mandatado por la Ley de Municipios Autónomos y el Reglamento Núm. 7539.

De igual manera, como bien consignó el foro apelado, la Junta de Subastas del Municipio no intervino ni autorizó el contrato en controversia. En este sentido, precisa advertir que, por mandato expreso de la ley regente municipal, entre los deberes de la Junta de Subastas se encuentra entender y adjudicar **todas las subastas que se requieran por ley; así como los contratos de arrendamiento**.

Por otra parte, la parte apelante argumentó que el Acuerdo no era un contrato típico de construcción, sino un contrato de arrendamiento que no requería del proceso de subasta pública. Al respecto, resaltamos que el Artículo 9.005 de la Ley núm. 81, *supra*, era claro al indicar que el arrendamiento de propiedad municipal se llevará a cabo mediante el método formal de subasta pública. En este particular, no surge de la abundante prueba documental que el Artículo 9.011 del estatuto, *supra*, sea aplicable. El Acuerdo de autos no es un simple contrato de arrendamiento de bienes inmuebles. Como surge del referido convenio, el arrendamiento era mixto, es decir, WB pagaría un canon de arrendamiento por los solares municipales y el Municipio pagaría, a su vez, un canon de arrendamiento por el uso del edificio, una vez culminado. Por ende, el Artículo 9.011 de la Ley núm. 81, *supra*, resulta inaplicable a la contratación aquí en controversia. Si bien el Municipio podía arrendar los solares municipales a WB, sin sujeción al requisito de subasta pública, la contratación aquí en controversia requería el

desembolso posterior por parte del Municipio de millones de dólares en arrendamiento.

Puntualizamos que en esta Sentencia no estamos pasando juicio sobre la modalidad de contratación conocida en inglés como *Design-Build-Operate-Maintain-Lease Purchase* o *Design-Build-Finance-Operate-Maintain-Transfer*. En el presente caso, se impugnó el Acuerdo celebrado entre las partes, por entender que el mismo es nulo por incumplir con la Ley núm. 81, aplicable a los municipios. En fin, reiteramos que, de los hechos esenciales incontrovertidos; así como de los documentos examinados, no surge ninguno de los criterios establecidos por nuestra jurisprudencia para obviar el proceso de subasta pública.

Así pues, es menester recordar que la contratación gubernamental se encuentra revestida del más alto interés público, por involucrar el uso de bienes o fondos gubernamentales.[41] Los preceptos legales que tutelan las relaciones económicas entre los municipios y las entidades privadas buscan promover una sana y recta administración pública.[42] "En resumidas cuentas, "el propósito de los estatutos que regulan la realización de obras y la adquisición de bienes y servicios para el Estado, sus agencias y dependencias, y los municipios, es la protección de los intereses y recursos fiscales del pueblo. De esta forma se evita el favoritismo, el dispendio, la prevaricación y los riesgos del incumplimiento". [citas omitidas]."[43] Por ello, el más alto foro ha señalado que las normas esbozadas por la ley y la jurisprudencia deben ser rigurosamente observadas aun en circunstancias de emergencia.[44]

Por último, apuntalamos que no es permisible que "personas privadas invoquen remedios en equidad frente a los municipios con

---

[41] *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706 (2018); *C.F.S.E. v. Unión de Médicos,* 170 DPR 443 (2007).
[42] *Hatton v. Mun. De Ponce,* 134 DPR 1001, 1005 (1994).
[43] Véase, *ALCO Corp. v. Mun. de Toa Alta*, supra, pág. 541.
[44] *Íd.*

los que contratan, porque 'es doctrina reiterada que dichos remedios no se aplicarán cuando resulte(n) contrario(s) a una clara política pública plasmada en un estatuto o en la Constitución'". [citas omitidas]."[45] La parte privada que contrata con una entidad gubernamental **debe velar por el cumplimiento de los requisitos legales, pues de lo contrario se expone al riesgo de asumir pérdidas sin poder reclamar remedios en equidad**.[46]

En conclusión, no se cometieron los errores señalados por la parte apelante. El foro apelado no erró al razonar que el Acuerdo, aquí en controversia, es nulo por ser un contrato de construcción que excedía los $200,000 y requería la celebración de una subasta pública y más aún, la participación de la Junta de Subasta Municipal en cumplimiento con el mandato expreso de la Ley núm. 81.

**IV.**

Por los fundamentos antes expuestos, confirmamos la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones

---

[45] *Íd.*, a las págs. 541-542.

[46] Véase, *Rodríguez Ramos et al. v. ELA et al*, 190 DPR 448 (2014); *Lugo v. Municipio de Guayama*, 163 DPR 208 (2004).